UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
L.R., Individually and on Behalf of and as Parent
of L.R., a student with a disability,

                        Plaintiff,                    Docket No.
                                                      15-CV-1542 (FB) (RML)

            - against -


NEW YORK CITY DEPARTMENT                              ECF Case
OF EDUCATION,

                        Defendant.
-----------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**


THOMAS GRAY
PARTNERSHIP FOR CHILDREN'S RIGHTS
Attorney for Plaintiff
271 Madison Avenue, 17th Floor
New York, New York 10016
(212) 683-7999 ext. 246
tgray@pfcr.org


June 26, 2015

# TABLE OF CONTENTS

PRELIMINARY STATEMENT                                                    1

STATEMENT OF FACTS                                                       1

LEGAL FRAMEWORK AND STANDARD OF REVIEW                                   10

ARGUMENT                                                                 14

POINT I: THE IHO CORRECTLY CONSIDERED ALL OF THE PARTIES'
ALLEGATIONS AND ARGUMENTS, AND ALL OF THE EVIDENCE IN
THE RECORD, IN DETERMINING THAT THE DOE DID NOT PROVIDE
L.R. WITH A FAPE FOR THE 2011-2012 SCHOOL YEAR                           14

    A.  The IHO was Correct to Consider the June 2011 IEP's Assessment
        Recommendations for L.R. in Determining that the DOE Failed to
        Provide L.R. with a FAPE                                           14

    B.  The June 2011 IEP's Recommendation that L.R. Take the Regents
        and the RCTs Demonstrates the DOE's Failure to Address L.R.'s
        Individual Needs and to Provide Him with an Appropriate
        Educational Plan                                                   21

    C.  The DOE's 15:1 Program was Not Appropriate for L.R.             27

POINT II: L.R.'S PLACEMENT AT COOKE WAS APPROPRIATE                      33

POINT III: THE EQUITIES FAVOR TUITION PAYMENT                            33

POINT IV: DIRECT PAYMENT OF TUITION IS APPROPRIATE                       35

CONCLUSION                                                               35

## PRELIMINARY STATEMENT

Plaintiff L.R. (or "Mr. R") commenced this action pursuant to the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S.C. § 1415(i)(2)(A), on behalf of and as parent of L.R. to seek reversal of a final administrative decision rendered by the New York State Review Officer ("SRO") finding that Defendant New York City Department of Education ("DOE") offered L.R. a free appropriate public education ("FAPE") for the 2011–2012 school year and denying Mr. R.'s request for an order directing the DOE to pay L.R.'s tuition at the Cooke Center for Learning and Development ("Cooke") for that school year.

## STATEMENT OF FACTS

L.R. was born in 1990 and is currently 24 years old (Exhibit ("Exh.") 8 at 1). He turned 21 years old and was in his final year of eligibility for services under the IDEA during the 2011-2012 school year (Exh. 8 at 1). 20 U.S.C. § 1412(a)(1)(A) (a state must ensure that "[a] free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive"); 8 N.Y.C.R.R. § 200.5(a)(5)(iii) (a "student continues to be eligible for a free appropriate public education until the end of the school year in which the student turns age 21 or until the receipt of a Regents or local high school diploma").

L.R. was first recommended for special education services when he was in the second grade (Impartial Hearing Transcript ("Tr.") 177). Over the course of his education L.R. has exhibited speech-language deficits that impede his ability to "understand what is being requested of him," "to learn," and to "perform well in academics" (Exh. 3 at 2-4). L.R. needs to have information repeated or he needs it to be visually demonstrated (Exh. 5 at 2). While L.R.'s ability to pay attention and his frustration tolerance has improved as he has grown, he has a history of significant difficulties with attention and hyperactivity (Exh. 5 at 1-2; Tr. 177).

L.R. first enrolled at Cooke in September 2006, his ninth grade year (Exh. 1 at 3; Tr. 177-78). In September 2009, L.R. enrolled at Cooke's Skills and Knowledge for Independent Living & Learning ("SKILLs") program – a program for 18 to 21 year old students with mild to moderate cognitive and developmental delays as well as students with severe language based disabilities (Exh. C; Tr. 96- 99). The SKILLs program is designed to develop students' foundational knowledge and skills for independence at home and integration into the community (Exh. C; Tr. 96- 99). The classes in the SKILLs program contain at most 12 students, and L.R.'s SKILLs classes generally contained eight students (Exh. C at 1; Tr. 120).

**The 2009 Evaluations**

After waiting over six years to reevaluate L.R., and in an attempt to comply with the IDEA's triennial reevaluation requirements at 20 U.S.C. § 1414(a)(2)(B)(ii), the DOE conducted a psychoeducational evaluation on November 22, 2009 and a social history evaluation on December 2, 2009 (Exh. 3; Exh. 5).

The psychoeducational showed a sharp contrast between L.R.'s non-verbal and verbal functioning as cognitive testing indicated that while L.R.'s non-verbal intelligence quotient ("IQ") of 82 was in the "low average range" his verbal IQ of 68 was in "the mildly deficient range" (Exh. 3 at 2). L.R. had "significant perceptive and expressive language difficulties" that affected his ability to learn as he did "not fully understand what was being requested of him" (Exh. 3 at 2). However, when he "was able to work in a preverbal and more perceptual level he tended to do much better" (Exh. 3 at 2). Testing showed L.R.'s visual-perceptual skills to be low average, which was "in line with his higher level of functioning in the non verbal area" (Exh. 3 at 3). The social history indicated that L.R. "needs things repeated or he needs to see it done" (Exh. 5 at 2). Despite L.R.'s history of speech and language deficits and the psychoeducational's

indication that L.R.'s overall verbal functioning was a particular area of weakness, the DOE did not conduct a speech and language evaluation to more fully illustrate L.R.'s difficulties understanding language and expressing himself.

### The June 6, 2011 Committee on Special Education Meeting and L.R.'s IEP for the 2011-2012 School Year

On June 6, 2011, the DOE convened a Committee on Special Education ("CSE") meeting to prepare L.R.'s IEP for the 2011-2012 school year (Compl. ¶ 55; Asr. ¶ 55). The participants at the June 2011 CSE meeting were: Jacqueline Giurato, the district representative and a special education teacher assigned to CSE Region 9; Nancy Levine, a DOE school psychologist; Gloria Gonsalves, a parent member of CSE Region 9; Mr. R.; Cooke educator Sally Ord; Kate Hibbard, L.R.'s literacy and math teacher at Cooke; and Victoria Fowler, the Cooke SKILLs program coordinator (Compl. ¶ 57; Asr. ¶ 57; *see* Exh. 8 at 2).

The following documents were available to the individuals at the June 2011 CSE meeting: the November 2009 psychoeducational, the December 2009 social history, L.R.'s 2010-2011 school year IEP, and a Spring 2011 Cooke progress report (Compl. ¶ 58; Asr. ¶ 58).

The participants at the CSE meeting acknowledged that L.R. struggled to make progress in his ability to read, write, and perform math even in his classes at Cooke, which typically had eight students (Exh. 8 at 3; Exh. 9 at 1; Tr. 120). Both Mr. R. and Cooke educator Ms. Ord objected to placing L.R. in a class with only one teacher and 15 students (Exh. 9 at 2; Tr. 114; 180-81). Nevertheless, the DOE declined to recommend a more supportive setting and placed L.R. in a program with a 15:1 student-to-teacher ratio (Compl. ¶ 59; Asr. ¶ 59). Additionally, the formulated IEP contained little specific information on L.R.'s speech and language deficits and impairments, and presented no cogent plan for enabling L.R. to learn despite his profound struggles with receptive and expressive language (*see* Exh. 8). The formulated IEP and the June

2011 CSE meeting minutes do not indicate why L.R. was ready to be transitioned out of Cooke's program, which he had attended the previous six school years and which had classes made up of three to 12 students, into a program with a larger student-to-teacher ratio for his final year in school (*see* Exh. 8; Exh. 9; Exh. C at 1; Tr. 120, 136, 178, 180-81).

While the IEP's "Diploma Objective" was for L.R. to earn an "IEP Diploma" (Exh. 8 at 14), the IEP also recommended that L.R. participate in both State and local assessments – the Regents Examinations ("Regents") or the Regents Competency Tests ("RCTs") (Exh. 8 at 12). At the time of the CSE meeting, L.R. was independently reading at the third grade level and his overall math skills were at the fourth grade level (Exh. 8 at 3; Tr. 147). Despite the fact that passing an RCT required a student to be functioning at a sixth grade level (Tr. 86, 113), and despite the fact that L.R. had never taken a Regents or been able to complete or pass an RCT (Tr. 112-13), the DOE made this recommendation as it has a "rule of thumb" that all students who are reading at or above a third grade level will take the Regents or the RCTs (Tr. 76, 87).

**The DOE's Recommended Placement School**

On July 11, 2011, the DOE identified H600, Clara Barton High School ("Clara Barton"), located in Brooklyn, New York, as L.R.'s placement school for the 2011-2012 school year (Exh. 14). In July 2011, Mr. R. called Clara Barton to arrange a visit, but was told that the summer program was different than the academic year program in which L.R. was placed and that he should visit in September (Exh. 15; Tr. 182-83). Along with Cooke educator Ms. Ord, Mr. R. visited Clara Barton on September 13, 2011 and met with a Clara Barton special education teacher, who confirmed that L.R. would "have to be placed in RCT classes to comply with" the June 2011 IEP (Exh. 17; Tr. 183-85). Through counsel, Mr. R. wrote to the DOE on September 14, 2011 to report that he had learned that Clara Barton was not appropriate for L.R. (Exh. 17).

4

**L.R.'s Enrollment and Educational Program at Cooke for the 2011-2012 School Year**

Mr. R. signed an enrollment contract for L.R.'s 2011-2012 school year at Cooke on March 18, 2011 (Exh. E). The contract afforded Mr. R. the flexibility to continue working with the DOE to identify a public school placement for L.R. and to withdraw L.R. from Cooke without financial penalty if the DOE offered L.R. an appropriate placement by October 31, 2011 (Exh. E ¶ 10.b). The contract provided that L.R.'s tuition at Cooke was $48,500.00 for the 2011-2012 school year and that Mr. R. was responsible for payment (Exh. E ¶ 2.a).

During L.R.'s 2011-2012 school year in Cooke's SKILLS program he was placed in a classroom with at most ten students (Tr. 101-02, 119, 136). On Mondays and Fridays, the classroom had only seven or eight students; on Wednesdays L.R. was in a three student classroom (Tr. 136). This small class setting provided L.R. with a significant amount of one-on-one academic instruction, which was "key" to meeting his academic needs (Tr. 136-37).

L.R. received speech and language therapy, occupational therapy, as well as individual counseling and group counseling at Cooke (Tr. 104-06). Cooke placed L.R. in an internship at a food services company because he was interested in becoming a cook (Tr. 108-09). L.R. also took transition skills classes that taught interview and job search skills, and – along with Mr. R. – he met with a Cooke social worker to prepare a transition plan that included registering for continued vocational and educational services (Tr. 107-08). L.R. made academic, social, and emotional progress at Cooke during the 2011-2012 school year (Tr. 116-117, 150-51).

**The Impartial Hearing**

Mr. R., through counsel, filed a due process complaint on April 23, 2012, alleging that the DOE denied L.R. a FAPE for the 2011-2012 school year because the DOE failed to adequately evaluate L.R., failed to prepare an appropriate IEP, and failed to offer an appropriate

5

placement school (Exh. 1). The complaint stated Mr. R.'s objection that under the June 2011 IEP L.R. would be placed in classes that focused on preparing for the RCTs (Exh. 1 at 4). Mr. R. requested an order directing the DOE to issue direct payment to Cooke for L.R.'s $48,500.00 2011-2012 school year tuition (Exh. 1 at 5-6). The case was assigned to impartial hearing officer ("IHO") Sharyn Finkelstein, who presided at a hearing on June 6 and June 28, 2012 (Tr. 1-223).

The DOE presented two witnesses: Ms. Giurato, the district representative at the June 2011 CSE meeting, and Vera Leykina, an assistant principal at Clara Barton (Tr. 14-92). In response to the DOE attorney's questioning on direct examination, Ms. Leykina described how the June 2011 IEP's assessment recommendation would have been implemented at Clara Barton (Tr. 17-18, 22-23). Ms. Giurato also explained that the DOE recommended that L.R. take the Regents and the RCTs because he was reading at or above a third grade level and the DOE had a "rule of thumb" that all students who are reading at or above a third grade level will take the Regents or the RCTs (Tr. 76, 87).

Mr. R. testified and presented two witnesses: Ms. Fowler, the administrative coordinator of Cooke's SKILLs program, and Ms. Hibbard, L.R.'s literacy and math teacher at Cooke during the 2010-2011 and 2011-2012 school years (Tr. 93-219). In addition to testifying about Cooke's program for L.R., Ms. Fowler and Ms. Hibbard testified that L.R. had only taken one RCT, which he was unable to complete and which proved an extremely stressful experience for him (Tr. 112-13, 140-43). Ms. Fowler testified that a class that was focused on RCT preparation would not allow L.R. to make meaningful progress because his academic functioning was too far below the level necessary to pass an RCT (Tr. 113). Ms. Fowler and Ms. Hibbard stated that L.R. would not be able to make progress in a 15:1 classroom because he needed more support and teacher guidance than a 15:1 setting provided (Tr. 114-15, 148).

6

**The IHO's Findings of Fact and Decision**

IHO Finkelstein issued a Findings of Fact and Decision ("FFD") on August 14, 2012, determining that there was no evidence to support the DOE's recommendation for L.R. to be placed in a 15:1 classroom and that the DOE had not presented a basis for why L.R. "was ready to learn in a larger environment" than he had been in at Cooke (FFD 10). The IHO noted that L.R. had been in "a smaller program for the past several years" and, coupled with the evidence of L.R.'s low IQ and his particular "difficulty with communication," there was no support in the record that L.R. could make progress in a 15:1 program (FFD 10).

The IHO also found that the June 2011 IEP's requirement that L.R. take the Regents and the RCTs was inappropriate and that there was no evidence the DOE "considered [L.R.'s] individual needs or capabilities in determining if he should participate in assessments" (FFD 10). The IHO wrote that "requiring [L.R.] to take both the Regents and RCT examinations was not appropriate and demonstrates a lack of understanding of [L.R.'s] individual needs" (FFD 10). Furthermore, requiring L.R. "to first fail an examination and then take yet another examination which in all likelihood was above his ability could have a negative emotional impact" (FFD 11). The IHO determined that while the DOE's failure to conduct a speech and language evaluation of L.R. was not itself a denial of a FAPE, the DOE's formulated IEP "was substantively inappropriate and the recommended placement was inappropriate" (FFD 9-11).

The IHO also determined that Mr. R. had shown that Cooke was an appropriate placement for L.R., and that the equities weighed in favor of Mr. R.; therefore, the IHO ordered the DOE to pay L.R.'s 2011-2012 school year tuition to Cooke "upon proof of contract and attendance" (FFD 11-14).

**The DOE's Administrative Appeal**

7

By a September 5, 2012 Verified Petition, the DOE appealed the IHO's decision to the SRO asking the SRO to annul the award of direct tuition payment to Cooke (Verified Petition ("Pet."). ¶¶ 6, 32-54). The DOE argued that its recommended 15:1 program was appropriate for L.R. (Pet. ¶¶ 35-38). The DOE asserted that its recommendation that L.R. take the Regents and the RCTs was appropriate, concluding that, "the IEP provided the Student with an opportunity to earn a local diploma, while at the same time providing a safety net should the Student not be successful on the State and local assessments" (Pet. ¶¶ 39-40).

The DOE asserted both that the IHO's finding that Clara Barton's classes were geared toward preparation for the Regents and the RCTs was beyond the scope of the due process complaint and should not have been considered (Pet. ¶¶ 42-43), and, alternatively, that the school could have appropriately implemented the June 2011 IEP (Pet. ¶¶ 44-47). The DOE asked the SRO to find that equitable considerations weighed against Mr. R.'s claim for tuition (Pet. ¶¶ 49-50), and asserted that even if the SRO ordered the DOE to fund L.R.'s 2011-2012 school year tuition at Cooke, it should deny Mr. R.'s request for direct tuition payment (Pet. ¶¶ 51-54).

The DOE did not appeal the IHO's finding that Cooke was an appropriate placement for L.R. (Compl. ¶ 104; Asr. ¶ 104).

By a Verified Answer and Cross Appeal, dated October 9, 2012, Mr. R. answered the DOE's Verified Petition, asking the SRO to affirm the IHO's determinations, but for the IHO's finding that the DOE's failure to conduct a speech and language evaluation of L.R. did not result in a FAPE denial, and dismiss the DOE's appeal.

The DOE filed a Verified Answer to the Cross-Appeal on October 26, 2012.

**The SRO Decision**

Pursuant to the federal regulations implementing the IDEA, the SRO was required to issue a decision in the DOE's appeal "not later than 30 days" after the receipt of the request for review. 34 C.F.R. § 300.515(b)(1). In flagrant violation of this mandate, the SRO did not issue a decision until November 25, 2014, nearly two years after the appeal was fully submitted and over 27 months after the IHO granted Mr. R.'s claim for tuition payment.

In decision number 12-178, SRO Carol H. Hauge sustained the DOE's appeal and dismissed Mr. R.'s cross-appeal. Despite the DOE's argument in its Verified Petition that the June 2011 IEP appropriately recommended that L.R. take the Regents and the RCTs, the SRO first determined that the IHO exceeded the scope of her jurisdiction in making findings on "whether the June 2011 CSE's recommendation for the student to participate in State and local assessments was appropriate, whether an 'IEP diploma'[1] was an 'unrealistic objective' for the student, and whether the assigned public school site was appropriate because classes were 'geared towards passing a Regents examination'" (SRO Appeal No. 12-178 ("SRO Dec.") at 9-11; *see* Pet. ¶¶ 39-40, 42-43). Then, in a footnote, the SRO alternatively found it appropriate for the DOE to recommend that L.R. take the Regents and the RCTs (SRO Dec. 10 n.5).

The SRO also determined that while the DOE's failure to conduct an updated speech and language evaluation was a procedural violation it did not result in a denial of FAPE (SRO Dec. 11-14). The SRO found that the evidence in the record supported the DOE's recommendation that L.R. be placed in a 15:1 program (SRO Dec. 15-16). In determining that a 15:1 program was appropriate for L.R., the SRO did not mention or analyze the testimony from Mr. R. and the Cooke educators that a 15:1: program was not appropriate for L.R. and did not explain how any

---

[1] This reference to an "IEP diploma" appears in both the IHO's decision and the SRO's decision and appears to be a typo, as the context of the sentences indicates that the IHO and SRO were referring to a "local diploma" (*see* FFD 10; SRO Dec. 9).

9

of the testimony or evidence in the record supported placing L.R. in a 15:1 program (*see* SRO Dec. 15-16).

With regard to the DOE's placement school, Clara Barton, the SRO first determined that any "arguments asserted by the parent … are speculative" and then alternatively determined that "the hearing record does not support the conclusion that the district would have violated the FAPE legal standard related to the IEP implementation" at Clara Barton (SRO Dec. 16-19).

The SRO made no findings with respect to the appropriateness of L.R.'s placement at Cooke or the equites of Mr. R.'s claim for tuition funding (*see* SRO Dec. 9-19).

## LEGAL FRAMEWORK AND STANDARD OF REVIEW

### The Purpose and Scope of the IDEA

The purpose of the IDEA is to ensure that all children with disabilities are provided with a "free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *Schaffer v. Weast*, 546 U.S. 49, 51 (2005). The IDEA seeks to ensure "that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(B).

To satisfy the IDEA's requirements, a school district must provide each disabled child with "special education and related services," 20 U.S.C. § 1401(9), that are "reasonably calculated to enable the child to receive educational benefits," *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982), and "tailored to meet the unique needs of a particular child," *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998).

In order to comply with the IDEA's mandate that every disabled child is provided a FAPE, a school district must comply with the IDEA's procedural requirements and develop an

10

IEP that is reasonably calculated to enable the child to receive educational benefits. *See Rowley*, 458 U.S. at 205-06 ("[i]t seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process … as it did upon the measurement of the resulting IEP against a substantive standard").

The district is also required to provide a placement school capable of implementing the IEP. *See T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009) (districts do not have "carte blanche to assign a child to a school that cannot satisfy the IEP's requirements").

**Tuition Claims Under the IDEA**

Under the standard set forth by the United States Supreme Court in *School Committee of Burlington v. Department of Education*, 471 U.S. 359 (1985), and *Florence County School District Four v. Carter*, 510 U.S. 7 (1993), a school district may be required to pay for educational services obtained by a parent for his child if: 1) the services offered by the district were inadequate or inappropriate ("Prong I"); 2) the services obtained by the parent were appropriate ("Prong II"); and 3) equitable considerations support the parent's claim ("Prong III"). *Carter*, 510 U.S. at 12, 16; *Burlington*, 471 U.S. at 369, 374. When the three *Burlington* prongs are satisfied, parents who have unilaterally placed their child in a private school may obtain payment for the tuition from the district. *Id.*

Furthermore, payment of the tuition directly to the private school is appropriate where a school is willing to admit the child of a low-income parent while the parent pursues his due process remedies under the IDEA. *See E.M. ex rel. N.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 453-54 (2d Cir. 2014) ("[i]ndeed, where the equities call for it, direct payment fits comfortably within the *Burlington-Carter* framework: like reimbursement, direct payment to the

private school that provided the required educational program 'merely requires [the school district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP'") (quoting *Burlington*, 471 U.S. at 370-71).

Parents seeking payment for the cost of a unilateral private school placement must first litigate their claim in an impartial due process hearing. *See* 20 U.S.C. § 1415(f). New York State law places the burden of proof at impartial hearings on school districts with respect to all issues other than the appropriateness of a unilateral private school placement selected by the parents. N.Y. Educ. L. § 4404(1)(c).

In two-tiered states such as New York, in which hearings are conducted at the school district level, the hearing decisions are subject to state-level appeals; in New York such appeals are conducted by the SRO. 20 U.S.C. § 1415(g); 8 N.Y.C.R.R. § 200.5(k). Once these administrative remedies have been exhausted, either the parent or the school district may seek independent judicial review in the state or federal courts. 20 U.S.C. § 1415(i)(2)(A).

### IDEA District Court Actions

"Motions for summary judgment customarily resolve IDEA actions in federal court. Under the IDEA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion. Rather, summary judgment 'is a pragmatic procedural mechanism for reviewing administrative decisions.'" *C.L. v. Scarsdale Union Free Sch. Dist.*, No. 10-CV-4315, 2012 WL 983371, at *7 (S.D.N.Y. Mar. 22, 2012) (internal citations omitted) (quoting *T.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009)); *rev'd on other grounds*, 744 F.3d 826 (2d Cir. 2014).

"[T]he district court must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence,'" giving "due weight" to

the administrative proceedings. *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112-13 (2d Cir. 2007) (internal citations omitted). The "SRO's or IHO's factual findings must be 'reasoned and supported by the record' to warrant deference." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 241 (2d Cir. 2012) (quoting *Gagliardo*, 489 F.3d at 114).

The court does not accord "due weight" when there are no administrative findings on an issue. *Jennifer D. ex rel. Travis D. v. New York City Dep't of Educ.*, 550 F.Supp.2d 420, 432 (S.D.N.Y. 2008). Nor does a court accord "due weight" to administrative proceedings when determining questions of law. *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005); *see also E.M. ex rel. N.M.*, 758 F.3d at 456-57 ("we need not defer to the findings of state administrative officers on questions, such as contract interpretation or the requirements of standing, that fall outside of their field of expertise"); *M.H.*, 685 F.3d at 244 (observing that the weight due to administrative determinations "will vary based on the type of determination at issue").

Generally, a reviewing court's "analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *M.H.*, 685 F.3d at 244. "Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not." *Id*. Additionally, where the administrative findings of the IHO and the SRO disagree and "where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court … to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment." *Id*. at 246.

13

A court should defer to an IHO's well-reasoned analysis when the SRO has not reached the issue. *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 82 (2d Cir. 2014).

## ARGUMENT

### POINT I: THE IHO CORRECTLY CONSIDERED ALL OF THE PARTIES' ALLEGATIONS AND ARGUMENTS, AND ALL OF THE EVIDENCE IN THE RECORD, IN DETERMINING THAT THE DOE DID NOT PROVIDE L.R. WITH A FAPE FOR THE 2011-2012 SCHOOL YEAR

#### A. The IHO was Correct to Consider the June 2011 IEP's Assessment Recommendations for L.R. in Determining that the DOE Failed to Provide L.R. with a FAPE

In finding that the DOE failed to provide L.R. with a FAPE for the 2011-2012 school year, the IHO determined that the DOE's inappropriate recommendation that L.R. take the Regents and the RCTs demonstrated the DOE's failure to address L.R.'s unique needs (FFD 10). The SRO annulled this determination, reasoning that "a review of the hearing record establishes that the IHO sua sponte addressed and decided issues that the parent did not raise in the due process complaint," and that "the IHO exceed her jurisdiction by addressing the" issue (SRO Dec. 9-11). The SRO's decision is unsupported and should not be afforded deference.

Initially, Mr. R. put the DOE on notice that he disagreed with L.R.'s placement in classes that focused on teaching to the RCTs. In a September 14, 2011 letter to the DOE, submitted after Mr. R. visited Clara Barton, Mr. R.'s counsel wrote that L.R.'s "IEP indicates his diploma objective is an IEP Diploma and that he will participate in State and local assessments (with accommodations). [Mr. R.] was informed that because [L.R.'s] IEP reads this way, he would have to be placed in RCT classes in order to comply with this mandate" (Exh. 17). Mr. R.'s April 23, 2012 due process complaint repeats this allegation (*see* Exh. 1 at 4 (stating that on his visit to Clara Barton Mr. R. "was informed that because [L.R.'s] IEP indicated an IEP diploma <u>and</u> he was to participate in State and local assessments, he would be placed in RCT classes in order to

comply with this mandate") (emphasis in original)). While, the issue was raised in the context of Mr. R.'s objections to Clara Barton, the September 2011 letter and the due process complaint put the DOE on "fair notice" of Mr. R.'s concern that under the June 2011 IEP L.R. would be placed in classes that focused on preparing students for State and local assessments. *See C.F. ex rel. R.F.*, 746 F.3d at 78 ("the waiver rule is not to be mechanically applied. The key to the due process procedures is fair notice and preventing parents from 'sandbag[ging] the school district' by raising claims after the expiration of the resolution period") (edits in original).

In fact, the DOE's arguments throughout the administrative adjudicatory process reveal that it was on notice that Mr. R. believed that under the June 2011 IEP L.R. would be placed in classes that were inappropriately focused on preparing for the RCTs. In its closing brief to the IHO, the DOE argued that the June 2011 IEP's assessment recommendations for L.R. demonstrated the "Substantive Adequacy of the IEP:"

> Moreover, as relevant here, the IEP directed that the Student would participate in New York State and local assessments with significant accommodations. Id. (listing 6 testing accom[m]odations). At the same time, the IEP's Transition Plan provided that the Student was eligible for graduation with an IEP Diploma. See Dept. Ex. 8-14. Thus, the IEP provided the Student with an opportunity to earn a local diploma, while at the same time providing a safety net should the Student not be successful on the State and local assessments

(Exh. 18 at 5). In responding to Mr. R.'s allegation that the June 2011 IEP would have placed L.R. in classes focused on preparing for the RCTs, the DOE asserted that requiring him to take the Regents and RCTs demonstrated the appropriateness of the June 2011 IEP.

Furthermore, in its Verified Petition submitted to the SRO, the DOE continued to assert that the June 2011 IEP's assessment recommendations demonstrated that the DOE had crafted an appropriate educational plan for L.R. The Verified Petition asserted that the IEP's assessment recommendations were appropriate as "the IEP provided the Student with an opportunity to earn

a local diploma, while at the same time providing a safety net should the Student not be successful on the State and local assessments" (Pet. ¶ 40). The DOE did not argue that the June 2011 IEP's assessment recommendations were beyond the scope of the due process complaint; rather the DOE argued that the record "does not establish that the CSE team should have recommended that L.R. participate in alternate rather than State and local assessments" and that the June 2011 IEP appropriately "recommended that [L.R.] participate in State and local assessments" (Pet. ¶ 39). The Verified Petition only asserted that the issue of whether Clara Barton could implement the June 2011 IEP's assessment recommendations was beyond the scope of the IHO's jurisdiction (*see* Pet. ¶¶ 42-44 ("Even assuming arguendo that the IHO was correct to address this issue … the testimony did not establish that the *instruction at Clara Barton* was 'geared' towards passing the Regents exams") (emphasis added). Therefore, any argument that Mr. R. did not give "fair notice" that he was challenging the appropriateness of the June 2011 IEP's assessment recommendations was waived by the DOE, and the SRO erred in addressing it. *M.Z. v. New York City Dep't of Educ.*, No. 12-CV-4111, 2013 WL 1314992, at *10 (S.D.N.Y. Mar. 21, 2013) ("The IHO in this case reached findings adverse to plaintiffs. Plaintiffs were obligated to cross-appeal those issues to the SRO in order to preserve the reviewability of those issues ... The Court therefore affirms the SRO's conclusion that plaintiffs' failure to cross-appeal the IHO's adverse findings waived their right to challenge those of findings") (citation omitted); *see also*, *for example*, SRO Appeal No. 15-030 at 9 n.7, n.9 (May 4, 2015) (stating that the unappealed portions of an "IHO's determinations are final and binding on the parties and will not be further addressed").[2]

---

[2] SRO decisions are available online at www.sro.nysed.gov/decisionindex/

Moreover, even assuming for the sake of argument that Mr. R. did not adequately raise the issue of the appropriateness of the June 2011 IEP's assessment recommendations in his April 2012 due process complaint, the DOE's conduct at the hearing "opened the door" to the issue. When a defending party raises an issue at a hearing that is beyond the scope of the due process complaint, the defending party has "opened the door" and an IHO may address the issue. *See M.H.*, 685 F.3d at 250 ("it does not follow from the fact that the DOE bears the burden of demonstrating that the IEP provides a FAPE that it should be permitted to argue issues outside the scope of the due process complaint without 'opening the door' for the plaintiffs"); *P.G. v. New York City Dep't of Educ.*, 959 F.Supp.2d 499, 515 (S.D.N.Y. 2013) (where "the DOE lawyer … raised the 12:1:1 class in her opening statement and elicited testimony on direct examination that the IEP was appropriate in part because it proscribed a 12:1:1 placement … the door was opened for Plaintiffs to object to the propriety of a 12:1:1 placement"); *Y.S. v. New York City Dep't of Educ.*, No. 12-CV-2590, 2013 WL 5722793, at *6 (S.D.N.Y. Sept. 24, 2013) ("DOE 'opened the door' to [a] challenge to the [IEP's] teaching methodology" where the DOE was "first to raise the issue of methodology when it examined [the child's] proposed teacher under the IEP" and the DOE "elicited [the teacher's] 'express or implied opinion' that the use of particular methodologies made the program appropriate for [the child]").

At the hearing, the DOE's attorney repeatedly elicited testimony as part of the DOE's case in chief that asserted the DOE's education program was appropriate for L.R. due to the June 2011 IEP's assessment recommendations. Upon calling the DOE's first witness, Ms. Leykina, the DOE's attorney almost immediately elicited testimony on how the June 2011 IEP's assessment recommendations would be implemented (Tr. 17-18). In describing Clara Barton's special education program, Ms. Leykina explained that the school served special education

17

students who were "not exempt from testing and they're taking all Regents exams […] You have

to make sure that every child who is eligible to take RCT takes the Regents and fails because

according to New York State regulations that RCT is not even going to be counted until the child

is attempting to take the Regents exam" (Tr. 18). Later in the direct examination of Ms. Leykina,

the DOE's attorney continued to focus on the June 2011 IEP's assessment recommendations:

> DOE attorney: Now if [L.R.] had been placed in any one of these 15:1 classes, would he
> have been able to take RCT examination?
>
> Ms. Leykina: Yes.
>
> DOE attorney : And can you just give the Hearing Officer an idea of how that would
> have worked had [L.R.] actually attended the school?
>
> Ms. Leykina: Well, every one of these classes is geared towards passing a Regents exam,
> which is much more rigorous exam and the children know before they're scheduled for
> exams in the fall -- in the winter and in the spring that they will have to appear and
> attempt to pass Regents exam. And if they fail, they will have to pass an RTC exam […]
> So any -- I mean every child who is in those classes is scheduled to take […] the exams

(Tr. 22-23). Additionally, the DOE attorney asked the DOE's next witness, Ms. Giurato, to

explain the inclusion of the June 2011 IEP's assessment recommendations:

> DOE attorney: Now in that same area of the page, a box -- the box at the top is checked,
> "The student will participate in state and local assessments."
>
> Ms. Giurato: Yes.
>
> DOE attorney: Can you please explain to the Hearing Officer why the IEP team elected
> to have the student [L.R.] participate in the state and local assessments?
>
> Ms. Giurato: Because he's functioning on a third to above third grade level and therefore
> he can participate in state and local assessments

(Tr. 76). Notably, the DOE attorney's exchanges with Ms. Leykina and Ms. Giuarato occurred

prior to parent's counsel's cross-examination and prior to Mr. R. calling his first witness (*see* Tr.

29, 78 (the start of parent's counsel's cross-examinations); Tr. 93 (the start of the examination of

Mr. R.'s first witness)). Indeed, it was only after the DOE attorney elicited testimony from the

DOE's witnesses concerning the June 2011 IEP's testing recommendations that parent's counsel elicited testimony regarding the inappropriateness of recommending that L.R. take the Regents and RCTs (*see* Tr. 85-88, 112-13, 140-43).

Contrary to the SRO's finding, the IHO did not raise the issue of the appropriateness of the June 2011 IEP's assessment recommendations "sua sponte" (SRO Dec. 9). Rather, Mr. R.'s September 2011 letter and his April 2012 due process complaint gave the DOE "fair notice" of his concern that under the June 2011 IEP L.R. would be placed in a classroom that was focused on preparing for the RCTs. Furthermore, the DOE's presented testimony and argument that the June 2011 IEP's recommendation that L.R. take the Regents and the RCTs demonstrated the "Substantive Adequacy of the IEP."

The SRO's decision does not specifically assess whether the DOE was on notice that Mr. R. was challenging the appropriateness of the DOE's assessment recommendations (*see* SRO Dec. 9-11). Without any assessment of the contents of the April 2012 due process complaint, the SRO determined that "the parent's due process complaint notice cannot reasonably be read to include the issues raised and decided sua sponte by the IHO regarding whether the June 2011 CSE's recommendation for the student to participate in State and local assessments was appropriate" (SRO Dec. 10). However, the SRO did attempt, in a footnote, to distinguish the circumstances of this case from the facts of *M.H.*, the leading Second Circuit case delineating when a school district has "opened the door" to an issue that was not specifically raised in a parent's due process complaint. The SRO's attempt is unavailing and evinces the SRO's deficient reasoning in overturning the IHO's decision. The SRO wrote:

> To the extent that the Second Circuit has held that issues not included in a due process complaint notice may be ruled on by an administrative hearing officer when the district 'open[s] the door' to such issues … I am not persuaded by the parent's contention that the district raised the issue of whether the June 2011

> CSE's recommendation for the student to participate in State and local
> assessments was first elicited through direct examination of a district witness.
> Rather, it appears that the direct examination pertained to routine questioning
> about the June 2011 IEP, and thus, the district did not 'open the door' to this issue
> under the holding of M.H.

(SRO Dec. 11 n.6) (alternations in original). Contrary to the SRO's determination, the facts of

this case closely parallel the facts of *M.H.* In *M.H.*, the parents "did not raise the issue of

teaching methodologies in the impartial hearing request," but

> [t]he parents, in their complaint letter, challenged the substantive sufficiency of
> the IEP offered to their son. The DOE chose to respond by arguing that the IEP's
> placement was better in part because it utilized multiple methodologies. In these
> circumstances, the statute does not bar the parents from contesting the
> appropriateness of the methodologies offered in the IEP's recommended program.

*M.H.*, 685 F.3d at 250-51. Like in *M.H.*, here the DOE introduced the issue of the June 2011

IEP's assessment recommendations at the hearing in response to the parent's challenge to the

sufficiency of the IEP and expressed concern about the appropriateness of the instruction L.R.

would receive in classes focused on preparing for the RCTs (Exh. 1; Exh. 17; Tr. 17-18, 22-23,

76). Similarly, the DOE argued that these recommendations demonstrated that the IEP was

appropriate for L.R. (Exh. 18 at 5). In this case, just as in *M.H.*, "it would be unfair to permit the

DOE to argue that its" assessment recommendations for L.R. were "appropriate," and "then to

bar the parents from contending that the schooling offered in the IEP was inappropriate" for L.R.

due to the IEP's assessment recommendations. *M.H.*, 685 F.3d at 250.

Additionally, *M.H.* does not speak to any distinction between the DOE raising an issue at

an impartial hearing and "routine questioning about" an IEP as the SRO implies. The SRO cites

to four cases to support its position (SRO Dec. 11 n.6, citing *D.B. v. New York City Dep't of*

*Educ.*, 966 F.Supp.2d 315 (S.D.N.Y. 2013), *N.K. v. New York City Dep't of Educ.*, 961

F.Supp.2d 577 (S.D.N.Y. 2013); *A.M. v. New York City Dep't of Educ.*, 964 F.Supp.2d 270

(S.D.N.Y. 2013), and *B.M. v. New York City Dep't of Educ.*, No. 12-CV-3247, 2013 WL
1972144 (S.D.N.Y. May 14, 2013). However, the SRO offers no explanation of how these cases
support its position that the DOE did not "open the door" because its "direct examination
pertained to routine questioning about the June 2011 IEP" (*see* SRO Dec. 11 n.6).

Only the *B.M.* case involves the concept of "routine questioning" that does not "open the
door" to an issue under the holding of *M.H.* However, the facts of *B.M.* are inapplicable to this
case. *B.M.* involved a parent's allegation regarding a particular teacher's "lack of special
education qualifications." *B.M.* at *5. The *B.M.* court determined that "the DOE made no
affirmative argument relating to [the teacher's] qualifications (or lack thereof) to which [the
parent] needed to respond; it merely elicited the information as part of routine questioning about
[the teacher's] background." *B.M.* at *6. In this case, the DOE affirmatively argued before the
IHO and the SRO that the June 2011 IEP's assessment recommendations demonstrated that the
DOE had provided L.R. with a FAPE (Pet. ¶ 40; Exh. 18 at 5-6; Tr. 17-18, 22-23, 76). Therefore,
*B.M.* is fully distinguishable from this case, and the SRO's attempt to distinguish this case from
the logic of *M.H.* is unavailing.

Thus, the SRO's determination that "the IHO exceeded her jurisdiction" in addressing the
June 2011 IEP's assessment recommendations is contrary to the record and the law and should
be afforded no deference.

**B. The June 2011 IEP's Recommendation that L.R. Take the Regents and the RCTs
Demonstrates the DOE's Failure to Address L.R.'s Individual Needs and to Provide
Him with an Appropriate Educational Plan**

The IHO correctly determined that the June 2011 IEP's requirement that L.R. "take both
the Regents and RCT examinations was not appropriate and demonstrates a lack of
understanding of [L.R.'s] individual needs" (FFD 10).

To earn a Regents high school diploma, a student must pass the Regents in English, mathematics, science, United States history and government, and global history and geography. 8 N.Y.C.R.R. § 100.5(a)(5). New York State students with disabilities, who like L.R. entered high school between September 1999 and September 2011, could earn a "local" high school diploma if, after failing each Regents required for graduation at least once, they took and passed the six RCTs – reading, writing, mathematics, science, United States history and government, and global history and geography (Tr. 18). 8 N.Y.C.R.R. §§ 100.5(a)(5)(a)(3)-(e)(3); *see also Memorandum from James P. DeLorenzo, Assistant Commissioner of the New York State Education Department, to District Superintendents, et al.* (July 2006) (available at www.p12.nysed.gov/specialed/publications/policy/55-64pass.htm) (last visited June 23, 2015)).

L.R. turned age 21 during the course of the 2011-2012 school year (Exh. 8 at 1). Therefore he was in his final year of eligibility for schooling under the IDEA. 20 U.S.C. § 1412(a)(1)(A); N.Y. Educ. L. § 4402(5). Prior to the 2011-2012 school year, L.R. had never taken a Regents or passed an RCT (Tr. 88, 112-13, 140-43). That the June 2011 IEP required L.R. to sit for 11 examinations – five Regents and six RCTs – so that he had "an opportunity to possibly get a local diploma" (Tr. 77) was both inappropriate for L.R. and demonstrates the DOE's failure to formulate recommendations to meet L.R.'s unique needs.

The record is clear that L.R. had little hope of passing even an RCT. The uncontroverted testimony from Cooke educators Ms. Fowler and Ms. Hibbard was that in the spring of 2011 L.R. had attempted to take one RCT, but had been unable to finish the test, which proved to be an extremely stressful experience for him (Tr. 112-13, 140-43). While the June 2011 IEP itself indicates that L.R. was reading independently at a third grade level and performing math at a fourth grade level (Exh. 8 at 3), DOE representative Ms. Giurato testified that a student must be

22

competent at a sixth grade level to pass the RCTs (Tr. 86). Indeed, the June 2011 IEP is itself

contradictory: the IEP recommends that L.R. take the Regents and RCTs, yet inconsistently

recognizes the futility of this recommendation as the IEP's "Diploma Objective" is for an "IEP

Diploma" (Exh. 8 at 14).[3]

Additionally, the testimony from Clara Barton Assistant Principal Ms. Leykina illustrates

how particularly inappropriate it was to require L.R. to take the Regents and RCTs. Ms. Leykina

testified that "every one of [L.R.'s] classes [would have been] geared toward passing a Regents

exam" (Tr. 22). She explained that L.R. would take both sets of examinations: "You have to

make sure that every child who is eligible to take [the] RCT[s] takes [the] Regents and fails

because according to New York State regulations that RCT is not even going to be counted until

the child is attempting to take [the] Regents exam" (Tr. 18).

Each Regents examination is three hours long (*see* www.nysedregents.org/ (copies of

past Regents, including the examinations from the 2011-2012 school year) (last visited June 23,

2015)). The RCTs are also three-hour long examinations (*see*, *for example*,

www.p12.nysed.gov/assessment/hsgen/2015/rct/342r-615.pdf (directions for administering a

2015 RCT) (last visited June 23, 2015)). As the June 2011 IEP allowed L.R. the accommodation

of "time limits extended to double-time with 5-minute breaks as needed" (Exh. 8 at 12), L.R.

would have needed an entire school day to take each test. Therefore, the June 2011 IEP

---

[3] Prior to July 1, 2013, without passing the Regents or the RCTs a student with a disability in
New York State could earn an "IEP diploma," which is not a regular high school diploma, but a
diploma "intended for a student with the most significant disabilities in recognition of his or her
successful achievement of individual educational goals," but which "is often not accepted by
employers, the military" and other post high-school programs "because it is not based on
standardized criteria." *Memorandum from James P. DeLorenzo, Assistant Commissioner of the
New York State Education Department, to District Superintendents, et al.* (April 2010) (available
at www.p12.nysed.gov/specialed/publications/iepdiploma.htm (last visited June 23, 2015)).

recommended that L.R. sit and prepare for 11 school days of examinations that he had little hope of passing.

In explaining why the DOE recommended that L.R. take the Regents and RCTs, Ms. Giurato reasoned that L.R. should be given the "opportunity to possibly get a local diploma" (Tr. 77). However, as demonstrated above, L.R. had little chance of passing even one RCT much less the five Regents or six RCTs he would have had to pass in his last year in school to obtain a local diploma (Exh. 8 at 3; Tr. 86, 112-13, 140-43). Thus, the record fully supports the IHO's determination that the June 2011 IEP's assessment recommendation "demonstrates a lack of understanding of [L.R.'s] individual needs" (FFD 10). Moreover, that the June 2011 IEP required L.R. sit for more than two full weeks of "State and local assessments" that he had little hope of passing supports the IHO's sound determination that requiring L.R. "to first fail an examination and then take yet another examination which in all likelihood was above his ability could have a negative emotional impact" (FFD 11).

Ms. Giurato also testified that the June 2011 IEP recommended that L.R. take the Regents and the RCTs because a DOE "rule of thumb" stated that all students who are functioning at or above the third grade level will take these tests (*see* Tr. 76, 87). This is contrary to the core principle of the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their *unique needs* and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A) (emphasis added). To this end, school districts are required to formulate an "*individualized* education program … for *each* child with a disability." 20 U.S.C. § 1414(d)(1)(A)(i) (emphasis added). As the Second Circuit has held, "'To meet [the IDEA's] requirements, a school district's program must provide 'special education and

24

related services[,]' [20 U.S.C. § 1401(9)], tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits' … These services 'must be administered according to an 'individualized education program' ..., which school districts must implement each year for each student with a disability.'" *M.H.*, 685 F.3d at 224 (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir.2007)) (alterations in original). Guidance from the U.S. Department of Education also emphasizes that a school district's placement decisions must be "*individually* determined on the basis of each child's abilities and needs and each child's IEP, and not solely on factors such as category of disability, severity of disability, availability of special education and related services, configuration of the service delivery system, availability of space, or administrative convenience." *U.S. Dep't of Educ., Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities*, 71 Fed. Reg. 46,540, 46,588 (Aug. 14, 2006) (emphasis added).

Thus, Ms. Giurato's justification for recommending that L.R. take the Regents and RCTs is profoundly inadequate and demonstrates that the IHO correctly determined that the June 2011 IEP's requirement that L.R. "take both the Regents and RCT examinations was not appropriate and demonstrates a lack of understanding of [L.R.'s] individual needs" (FFD 10).

In a footnote, the SRO attempts, "for the sake of argument," to justify the June 2011 IEP's assessment recommendation (SRO Dec. 10 n.5). The SRO first points to 20 U.S.C. § 1412(a)(16)(A) and 34 C.F.R. § 300.160(a), which require States to ensure that "[a]ll children with disabilities are included in all general State and districtwide assessment programs … with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs." Contrary to the SRO's determination, this

25

language does not justify requiring that L.R. take a full program of Regents and RCTs regardless of his individual needs. Rather this language emphasizes that assessing a disabled child must be individualized consistent with the overarching purpose of the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their *unique needs*." 20 U.S.C. § 1400(d)(1)(A) (emphasis added).

The SRO next cites to a memorandum from the Office of Special Education Programs ("OSEP") of the U.S. Department of Education for the proposition that the "CSE cannot exempt students with disabilities from participating in State or local assessments" (SRO Dec. 10 n.5). First, the SRO's statement that students with disabilities must participate in State and local assessments is absurd and rendered meaningless by the SRO's very next sentence that acknowledges that if "the CSE determines that the student cannot participate in State or local assessments even with accommodations, then the CSE must recommend that the student participate in alternate assessments" (SRO Dec. 10 n.5). Moreover, the cited memorandum from OSEP lays out the general criteria for when a student may participate in alternate assessments and states that "Alternate assessments … should not be assumed appropriate only for those students with significant cognitive impairments. The need for alternate assessments depends on the individual needs of the child, not the category of the child's disability." *Memorandum from Judith E. Heumann, Assistant Secretary, Office of Special Education and Rehabilitative Services, et al.* (Aug. 24, 2000) (available at www2.ed.gov/policy/speced/guid/idea/letters/2000-3/osep002482400assesssec.pdf) (last visited June 25, 2015). Thus, the U.S. Department of Education guidance only reinforces the IDEA's mandate that a school district must meet each child's unique needs, including the child's needs as related to assessments. The SRO also cites to

the "New York State Alternate Assessment" standard that only students with "severe disabilities" are eligible to take alternate assessments (SRO Dec. 10 n.5). However, this standard is contrary to the cited guidance on alternate assessments from OSEP, as well as the IDEA's core principle that each child's unique needs must be met.

The SRO's determinations regarding the June 2011 IEP's assessment recommendations are unfounded. The IHO's determination that the DOE inappropriately recommended that L.R. take both the Regents and the RCTs was within the IHO's jurisdiction, well-supported by the record, and well-reasoned. Therefore, the IHO's determination should be afforded deference.

**C.  The DOE's 15:1 Program was Not Appropriate for L.R.**

The IHO determined that the DOE's 15:1 program recommendation was "not appropriate" for L.R. and that there was "no evidence of any meaningful discussion that took place with respect to why the [IEP] team felt [L.R.] was ready to learn in a larger environment" (FFD 10). The SRO reversed this determination, finding that a 15:1 program was "reasonably calculated to enable the student to receive educational benefits, and thus, offered the student a FAPE" (SRO Dec. 16). The SRO's determination is not well-reasoned, is not well-supported by the record, and should not be afforded deference.

In determining that a 15:1 program was appropriate for L.R., the SRO first recounted some of the contents of the June 2011 IEP (SRO Dec. 15, citing Exh. 8 at 3-4). However, contrary to the logic of the SRO's decision, that the IEP reflected some of L.R.'s academic and social functioning is not itself a justification for placing him in a 15:1 program without an explanation of why L.R.'s functioning justifies such a placement. The SRO decision is devoid of an explanation for why L.R.'s academic and social functioning supports placing him in a classroom with one teacher and 15 students (SRO Dec. 15-16). *M.H.*, 685 F.3d at 249 ("the

27

SRO's conclusory statement does not evince thorough and well-reasoned analysis that would require deference"); *see also B.R. ex rel. K.O. v. New York City Dep't of Educ.*, 910 F.Supp.2d 670, 676 (S.D.N.Y. 2012) (stating that an SRO's determination should not be afforded deference where it is based on "conclusory generalities and unsupported assertions").

Similarly, the SRO notes that the IEP contained a list of "management needs" that L.R. required to progress, such as "small group instruction," "repetition and rehearsal," and "direct teacher modeling and prompts" (SRO Dec. 15, citing Exh. 8 at 3). However, that the IEP contained some of the management needs L.R. required to learn does not support placing him in a 15:1 program (SRO Dec. 15). There is no question that L.R. needed supports such as "small group instruction," "repetition and rehearsal," and "direct teacher modeling and prompts" in order to progress. Mr. R.'s objection to DOE's educational recommendations was not to the IEP's description of L.R.'s management needs; rather, Mr. R. objected to placing L.R. in a 15:1 program because L.R.'s management needs could not be addressed appropriately in a 15:1 classroom; that is, L.R. would not receive enough "small group instruction," "repetition and rehearsal," and "direct teacher modeling and prompts" in a class with one teacher and 15 students (Exh. 1 at 4; Exh. 16; Tr. 180-81).

In fact, the IHO was correct to determine that there was "no evidence of any meaningful discussion" of why L.R., who had attended a more supportive program at Cooke for the prior six school years, was now ready to be placed in a larger learning environment (FFD 10; Exh. C at 1; Tr. 99, 178). The SRO overturned this determination, writing that the "June 2011 CSE considered and discussed the student's evaluative information and input provided by individuals attending the CSE meeting" (SRO Dec. 15). However, here again, the SRO's decision offers no explanation for how the evaluative information or any individual's input supported placing L.R.

28

in a 15:1 program (*see* SRO Dec. 15-16). *M.H.*, 685 F.3d at 249; *B.R. ex rel. K.O.*, 910

F.Supp.2d at 676.

In fact, the evaluative and other information that was before the individuals at the June

2011 CSE meeting fully supports the IHO's determination that there was no basis for placing

L.R. in a larger learning environment (Exhs. 3, 5, 12, 13; Tr. 63-65). The November 2009

psychoeducational indicates that L.R. had "significant perceptive and expressive language

difficulties" and that he did "not fully understand what was being requested of him" (Exh. 3 at

2). The evaluator wrote that L.R.'s scores on the cognitive testing "tend[ed] to indicate that his

receptive and expressive difficulties are [the] fundamental issue for him in his overall academic

achievement" (Exh. 3 at 3). The December 2009 social history indicates that L.R. needed "things

repeated or he needs to see it done" to help him learn (Exh. 5 at 2). The 2009 evaluations

indicate that L.R. had profound limitations in his ability to understand and use language and do

not justify placing him in a 15:1 program. Indeed, the IHO appropriately recognized that the

evaluative information that indicated that L.R.'s "IQ is in the low to very low range and [his]

difficulty with communication" indicated that a 15:1 "class ratio was not appropriate" (FFD 10).

A Spring 2011 Cooke progress report that was before the individuals at the June 2011

CSE meeting (Tr. 63-65), indicates that L.R. struggled "to respond directly to or critically to his

peers" and that he still needed "frequent guiding prompts" in class conversations in literacy class

(Exh. 12 at 1-3). L.R. continued to need "frequent guiding prompts," "support from small group

instruction," and "support from his teacher and peers" in math (Exh. 12 at 1, 4). This progress

report offers no support for placing L.R. in a 15:1 program, and the SRO offers no explanation

for why the report supports DOE's program recommendation (*see* SRO Dec. 15-16).

Moreover, as the IHO acknowledged, all of the individuals at the June 2011 CSE meeting who actually knew L.R. and worked with him, stated that a 15:1 program did not offer L.R. the support he required to progress (Exh. 9 at 2; Tr. 180-81; *see* FFD 10 ("The people who really know [L.R.] all expressed his need for a 'significant amount of support'")). Mr. R. testified that a 15:1 program was "too big" for L.R. (Tr. 180-81). Cooke educator Ms. Fowler, who worked with L.R. for three school years, testified that L.R. needed more frequent small group instruction and individual support than a 15:1 classroom could provide (Tr. 99, 114-15). L.R. needed more support to follow multi-step instructions and "to stay on top of deadlines" than one teacher in a "room of 15 students" could furnish (Tr. 115). Cooke educator Ms. Hibbard, who worked with L.R. for two years, testified about L.R.'s ability to function in her classes that had at most ten students (Tr. 126-36). She stated that being able to work with L.R. one day a week with only two other students in the class was "key" for him, and that a 15:1 class was "too large" (Tr. 136-37, 148). *Cf. C.F. ex rel. R.F.*, 746 F.3d at 81 (finding that the DOE did not offer a student a FAPE where "all witnesses familiar with" the student testified that he needed a more individualized program, and where the only rebuttal the DOE offered was from a DOE special education teacher who stated that the student "would fit in her classroom"); *S.B. and E.G. v. New York City Dep't of Educ.*, No. 14-CV-0349(SAS), at 34-35 (S.D.N.Y. June 25, 2015) ("the SRO's reliance on *one* district special education teacher's contention that [the child] did not require 'any additional teaching support' over the testimony of *two* teachers who knew [the child] and taught [the child] in class — *without noting the IHO's finding of credibility for or against any witness* — flies in the face of reason") (emphasis in original).

Critically, the SRO only acknowledged that "the parent and the Cooke representative voiced [...] concern" about the 15:1 program, but never addressed the detailed testimony from

Mr. R. and the Cooke educators describing why a 15:1 program would be inappropriate for L.R.,
and did not weigh this evidence against the evidence the DOE presented to support its 15:1
program recommendation (*see* SRO Dec. 15-16). *M.H. v. New York City Dep't of Educ.*, 712
F.Supp.2d 125, 162 (S.D.N.Y. 2010) (finding that an SRO decision was not thorough and
careful, and not entitled to deference, where the SRO "failed to explain or distinguish evidence
contradicting that on which he relied"), *aff'd*, 685 F.3d 217 (2d Cir. 2012); *see also F.O. v. New
York City Dep't of Educ.*, 976 F.Supp.2d 499, 514-15 (S.D.N.Y. 2013) ("Indeed, it is difficult to
imagine how failing to address conflicting evidence could produce a 'well- reasoned' decision").

The primary justification that the DOE offered at the impartial hearing for placing L.R. in
a 15:1 program was Ms. Giurato's testimony that a 15:1 program was the most appropriate
program available for L.R. on the DOE's "continuum of services" (Tr. 89-90). The SRO errantly
adopted this reasoning, writing that "the June 2011 CSE considered, but rejected, a 12:1+1
special class placement at a specialized school because it was 'too restrictive' for the student"
(SRO Dec. 16). Initially, the SRO confuses the facts underlying the formulation of the June 2011
IEP with the phrase "the June 2011 CSE considered, but rejected" (SRO Dec. 16). In fact, the
record is clear that there was no consensus at the June 2011 CSE meeting regarding the
appropriate educational program for L.R. Both Mr. R. and a Cooke educator objected to the 15:1
program recommendation (Exh. 9 at 2; Tr. 114, 180-81). The individuals at the June 2011 CSE
meeting did not act in consensus as the SRO's language suggests. "The June 2011 CSE" did not
"consider" or "reject" anything. Rather, the CSE meeting ended with an unresolved disagreement
over whether a 15:1 program was appropriate for L.R. (Exh. 9 at 2).

Furthermore, that the DOE's "continuum of services" only allowed the DOE to consider
a 15:1 program in a community school or a 12:1+1 program in a specialized school – a school

that only serves disabled students – for L.R. is not a justification for placing L.R. in a 15:1

program. Any bureaucratically imposed choice between an appropriate special class staffing ratio

for instructional time, and appropriate access to general education students during non-

instructional time was improper. The DOE's educational program for L.R. had to be

"individually determined" based on L.R.'s "abilities and needs" and not solely on the basis of his

"category of disability" or "severity of disability." 71 Fed. Reg. at 46,588. The DOE is required

"to make available a full continuum of alternative placement options that maximize opportunities

for its children with disabilities to be educated with nondisabled peers to the extent appropriate."

71 Fed. Reg. at 46,588. A district "must provide a continuum of alternative placements that meet

the needs of the disabled children that it serves." *T.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d

145, 165 (2d Cir. 2014); *see also* 71 Fed. Reg. at 46,588 (placement decisions may not be based

solely on the "configuration of the service delivery system"). Therefore, Ms. Giurato's assertion

that the 15:1 program in a community school was more appropriate for L.R. than a 12:1:1

program in a specialized school is not a legitimate justification for placing L.R. in the 15:1

program without any evidence that he could actually make progress in a classroom with one

teacher and 15 students. And, as demonstrated above, there is no evidence in the record from an

educator or clinician who actually worked with or evaluated L.R. that supports placing L.R. in a

15:1 program. At best, Mr. Giurato's testimony that a 15:1 program was appropriate for L.R. is a

"[b]are, unsubstantiated, conclusory assertion" that is "far from sufficient for the Department to

carry its burden." *B.O. ex rel. K.O.*, 910 F.Supp.2d at 678.

It was the DOE's burden to prove that its educational recommendations for L.R. were

appropriate. N.Y. Educ. L. § 4404(1)(c). It did not meet that burden in this case. The IHO's

determination that there was "no evidence of any meaningful discussion that took place with

32

respect to why the [IEP] team felt [L.R.] was ready to learn in a larger environment" is well supported and should be afforded deference (FFD 10). *C.F. ex rel. R.F.*, 746 F.3d 68, 82 (2d Cir. 2014); *see also Brock and Dutton ex rel. S.B.*, No. 13-CV-8673, 2015 WL 1516602, at \*7 (S.D.N.Y. Mar. 31, 2015) (finding "that the IHO's decision is well[]reasoned and warrants deference" where DOE did not satisfy "its burden to show that the record evidence supported the provision of a FAPE to" a child). As the SRO's decision "failed to support his findings with a thorough and careful evaluation of the evidence" and is inadequately reasoned, it should be afforded no deference. *F.O.*, 976 F.Supp.2d at 518.

### POINT II: L.R.'S PLACEMENT AT COOKE WAS APPROPRIATE

The IHO ruled in favor of Mr. R. on *Burlington* Prong II, finding that he had demonstrated the appropriateness of L.R.'s placement at Cooke (FFD 11-12). The DOE did not appeal this determination to the SRO (Compl. ¶ 104; Asr. ¶ 104). The IHO's unappealed Prong II determination is final and binding on the parties and is not properly before this Court. *See* Ans. ¶¶ 142–45 (raising no Prong II defense); *C.F. v. New York City Dep't of Educ.*, No. 11-CV-00157, 2011 WL 5130101, at \*12 (S.D.N.Y. Oct. 28, 2011) ("Any aspects of the IHO's decision that were not appealed to the SRO are now final and binding on the parties").

### POINT III: THE EQUITIES FAVOR TUITION PAYMENT

Equitable considerations bear on the appropriate relief to be awarded under the IDEA, *Burlington*, 471 U.S. at 374, and "'include the parties' compliance or noncompliance with state and federal regulations pending review, the reasonableness of the parties' positions, and like matters.'" *Wolfe v. Taconic-Hills Cent. School Dist.*, 167 F.Supp.2d 530, 534 (N.D.N.Y. 2001) (quoting *Burlington v. Dep't of Educ.*, 736 F.2d 773, 801-02 (1st Cir. 1984)).

Mr. R. participated in the June 2011 CSE meeting, agreeing with some aspects of recommendations for L.R. that were discussed, such as academic and other goals, but objecting to the recommendation that L.R. be placed in a class with one teacher and 15 students (Exh. 9 at 2; Tr. 180-81). After receiving the notice that L.R. was to be placed at Clara Barton for the 2011-2012 school year, Mr. R. visited the school as soon as the school allowed (Tr. 181-83). By letters dated July 21, August 22, and September 14, 2011, Mr. R. informed the DOE of his concerns with the June 2011 IEP and L.R.'s placement at Clara Barton, and he timely notified the DOE of his intent to enroll L.R. at Cooke (Exh. 15; Exh. 16; Exh. 17). The contract that Mr. R. signed on March 8, 2011 to enroll L.R. at Cooke for the 2011-2012 school year contained a clause that allowed him to keep working to find an appropriate DOE educational program and released him if, prior to October 31, 2011, he chose to accept a DOE placement (Exh. E ¶ 10.b).

The record establishes that Mr. R. cooperated with the DOE and did not impede the DOE's ability to offer L.R. a FAPE. As such, the equities favor an award of tuition payment. *Cf. N.R. ex rel. T.R. v. Dep't of Educ. of New York City*, No. 07-CV-9648, 2009 WL 874061, at *6 (S.D.N.Y. Mar. 31, 2009) (finding in favor of a parent on *Burlington* Prong III where record was "bereft of any evidence that [a parent] hindered [the DOE's] efforts to provide a FAPE or otherwise frustrated the placement process"); *see also M.M. v. New York City Dep't of Educ.*, 26 F.Supp.3d 249, 259 (S.D.N.Y. 2014) (where there was no evidence that a parent had been uncooperative in the process of developing an IEP "the DOE ha[d] not met its burden of showing that the equities do not favor reimbursement").

Moreover, as the IHO determined that the equities favored Mr. R.'s claim (FFD 13-14), and the SRO did not address the equities of the case, the IHO's decision should be given

34

deference. *C.F. ex rel. R.F.*, 746 F.3d at 82 ("As neither the SRO nor the district court reached this issue, we again look to the opinion of the IHO").

## POINT IV: DIRECT PAYMENT OF TUITION IS APPROPRIATE

This Court should order the DOE to pay L.R.'s 2011-2012 tuition directly to Cooke. *See E.M. ex rel. N.M.*, 758 F.3d at 453-54 (holding that "the broad spectrum of equitable relief contemplated under the IDEA encompasses, in appropriate circumstances, a 'direct-payment' remedy" and that a direct payment remedy "furthers the IDEA's remedial purposes by extending the unilateral withdrawal option to parents with limited financial means, who otherwise could not avail themselves of it"). The terms of the Cooke enrollment contract unambiguously creates a binding obligation on the part of Mr. R. to pay L.R.'s tuition for the 2011–2012 school year in the amount of $48,500 (Exh. E ¶ 2.a). Moreover, Mr. R. presented uncontroverted evidence that he lacked the financial resources to front the costs of the Cooke tuition: Mr. R. testified that his total income for the 2011 was $39,000, which supported both himself and L.R. (Tr. 191-92). Thus, an award of direct tuition payment is appropriate.

## CONCLUSION

For the reasons set forth above, we respectfully request that the Court overturn the SRO's decision and issue an award in favor of Mr. R.

Dated: New York, New York
      June 26, 2015               /s/ Thomas Gray
                                 THOMAS GRAY
                                 PARTNERSHIP FOR CHILDREN'S RIGHTS
                                 Attorney for Plaintiff
                                 271 Madison Avenue, 17th Floor
                                 New York, NY 10016
                                 (212) 683-7999 ext. 246
                                 tgray@pfcr.org