UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------x
L.R., Individually and on Behalf of and as
Parent of L.R., a student with a disability,

                             **MEMORANDUM AND ORDER**

               Plaintiff,            15-CV-1542 (FB) (RML)

       -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION,

               Defendant.

-------------------------------------------------x

*Appearances:*
*For the Plaintiff:*
THOMAS GRAY
Partnership for Children's Rights
271 Madison Avenue, 17th Floor
New York, NY 10016

*For the Defendant:*
ZACHARY W. CARTER
Corporation Counsel of the City of
New York
100 Church Street
New York, NY 10007

By: Sabrina Y. Hassan
Assistant Corporation Counsel

**BLOCK, Senior District Judge:**

      Plaintiff, Mr. R., brings this action on behalf of his son, L.R., against the New York

City Department of Education ("DOE"), under the Individuals with Disabilities Education

Act ("IDEA"), challenging a state administrative determination that the DOE provided

L.R. with a free appropriate public education ("FAPE").  He seeks tuition reimbursement

for the private school L.R. attended during the 2011-12 school year.  The Court grants summary judgment to Mr. R.[1]

## I

Under the IDEA, states receiving federal funds are required to "provide 'all children with disabilities' a [FAPE]."  *Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist.*, 773 F.3d 372, 376 (2d Cir. 2014) (quoting 20 U.S.C. § 1412(a)(1)(A)).  "A FAPE consists of special education and related services tailored to meet the unique needs of a particular child, which are reasonably calculated to enable the child to receive educational benefits."  *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 238-39 (2d Cir. 2015).  "To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ('IEP') for each such child."  *Id.* (quoting *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012)).  An IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives," *R.E.* 694 F.3d at 175, and it "must be likely to produce progress, not regression, and must afford the student with an

_____

[1] Although the term "summary judgment" may be used in an IDEA action, "the procedure is in substance an appeal from an administrative determination." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012) (quoting *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)).

opportunity greater than mere trivial advancement." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012).

In New York, Committees on Special Education ("CSEs") are responsible for creating IEPS. They are "comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." *M.O.*, 793 F.3d at 239; N.Y. Educ. Law § 4402(1)(b)(1).

Parents who believe their child is not being provided a FAPE "may unilaterally enroll the child in a private school and seek tuition reimbursement from the school district." *M.O.*, 793 F.3d at 239 (citing 20 U.S.C. § 1412(a)(10)(C)(ii); N.Y. Educ. Law § 4404(1)). In New York City, parents seek tuition reimbursement by filing a due process complaint, which triggers "an administrative procedure by which the board of education appoints an Independent Hearing Officer ('IHO') who conducts a formal hearing and fact-finding." *Id.* (citing N.Y. Educ. Law § 4404(1)). The hearing is governed by the three-pronged *Burlington/Carter* test: "(1) the DOE must establish that the student's IEP actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013). The IHO's decision may be appealed to a State Review

Officer ("SRO").  *Id.* (citing 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2))  Finally, the SRO's decision may be challenged through the filing of a civil action in state or federal court.  *Id.*  (citing 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3)).

"The role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed."  *C.F. ex. rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014) (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112-13 (2d Cir. 2007)).  "The standard of review 'requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review.'" *Id.* (quoting *M.H.*, 685 F.3d at 244).  In reviewing the administrative decisions of the SRO and IHO, the Court "must give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *M.H.*, 685 F.3d at 240 (quoting *Gagliardo*, 489 F.3d at 113).

When the IHO and SRO disagree, the Court defers "to the reasoned conclusions of the SRO as the final state administrative determination." *C.F. ex rel R.F.*, 746 F.3d at 77 (quoting *M.H.*, 685 F.3d at 246).  However, "where the SRO's determinations are insufficiently reasoned to merit deference," or the SRO did not reach a particular issue, "the courts should defer to the IHO's analysis." *Id.*  The degree of deference the Court should afford "hinge[s] on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed

4

is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *M.H.*, 685 F.3d at 244.

## II

L.R., who turned 21 years old during the 2011-12 school year,[2] has been classified by the DOE as a student with a learning disability. L.R. first enrolled in the Cooke Center for Learning and Development ("Cooke"), a private, special-needs school, for his ninth-grade year in September 2006. Beginning in the 2009-10 school year, L.R. enrolled in Cooke's Skills and Knowledge for Independent Living & Learning ("SKILLS") program—a program for 18 to 21 year old students with mild to moderate cognitive and developmental delays or severe language-based disabilities. Cooke's SKILLS classes contain at most 12 students, and L.R.'s SKILLS classes had between eight and ten students. The DOE paid L.R.'s Cooke tuition for the 2006-07 through the 2010-11 school years.

On June 6, 2011, the DOE convened a CSE to prepare L.R.'s IEP for the 2011-12 school year. The CSE drafted an IEP that outlined L.R.'s performance, annual goals, needed special services, designated him to be placed in 15:1 academic classes,[3] and indicated that he will participate in state and local assessment tests. On July 11, 2011, the

---

[2] The 2011-2012 school year was L.R.'s final year of eligibility for a FAPE under the IDEA. 20 U.S.C. § 1412(a)(1)(A).

[3] A "15:1 class" describes a classroom with a student-to-teacher ratio of 15 students and one teacher.

5

DOE issued a "Notice of Final Recommendation" that designated Clara Barton High School as L.R.'s placement school.

In September 2011, Mr. R. visited Clara Barton and met with a special-education teacher.  Mr. R. testified that an individual at Clara Barton informed him that the school was not appropriate for L.R., and suggested he seek an alternative placement from the DOE.  Based on the visit, Mr. R. wrote to the DOE to report that Clara Barton was not an appropriate placement for L.R. and that he enrolled L.R. at Cooke for the 2011-12 school year.

Mr. R. filed a due-process complaint with the DOE on April 23, 2012, alleging that the DOE denied L.R. a FAPE and seeking payment of L.R.'s Cooke tuition for the 2011-12 school year.  The due-process complaint asserted, among other things, that a "15:1 class would not provide [L.R.] [the] intensive support or with the academic management needs recommended on his IEP."  Due-Process Complaint, ECF 10-8, ex. 1 at 3.

IHO Sharyn Finkelstein held a hearing on June 28, 2012.  Vera Leykina, an assistant principal at Clara Barton, and Jacqueline Giurato, a DOE special-education teacher who was a member of L.R.'s CSE, testified for the DOE.  Victoria Fowler, an administrative coordinator at Cooke, Kathryn Hibbard, a head teacher at Cooke and L.R.'s teacher for two years, and Mr. R. testified on L.R.'s behalf.

In a written decision, the IHO determined that the DOE denied L.R. a FAPE, because, among other reasons, the 15:1 class placement was inappropriate.  She also

determined that Cooke was an appropriate placement and that the equities favored tuition reimbursement.  The DOE appealed the IHO's decision to an SRO.

SRO Carol H. Hauge reversed because after reviewing the IEP and Ms. Giurato's testimony, she determined the "15:1 special class placement—together with the annual goals and recommended supports and related services—was reasonably calculated to enable the student to receive educational benefits."  SRO Opinion, ECF 10-1, at 16.

Mr. R. subsequently filed this action seeking reversal of the SRO's order.[4]

## III

## A

The principal issue in this case is whether the DOE provided a FAPE to L.R. Because the SRO determined that the DOE had carried this burden, "the burden of demonstrating that the [SRO] erred is properly understood to fall on [Mr. R.]." *M.H.*, 685 F.3d at 225 n.3.

The SRO determined that "the evidence in the hearing record supports the district's assertion that the 15:1 special class placement—together with the annual goals and recommended supports and related services—was reasonably calculated to enable the

---

[4] In addition to the 15:1 class-placement issue, Mr. R. argues that the IEP's direction that L.R. take state and local assessments was inappropriate.  The IHO agreed, but the SRO determined that the issue was not properly raised and therefore outside the IHO's jurisdiction to consider it. Because the Court finds that L.R. was denied a FAPE based on the 15:1 class placement, it is not necessary to decide whether the assessment issue is properly before the Court, or the merits of that argument.

student to receive educational benefits." SRO Opinion at 16. To be sure, considerations of appropriate class size are matters of educational policy on which courts should afford greater deference to administrative findings. *M.H.*, 685 F.3d at 244 ("[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures."); *F.O. v. N.Y.C. Dep't of Educ.*, 976 F. Supp. 2d 499, 511 (S.D.N.Y. 2013) ("[C]lass size and instructional programming are matters of educational policy concerning which courts defer to a state administrative officer."). But, while the Court recognizes that it lacks the educational expertise of the SRO, the following careful review of the SRO's opinion demonstrates that it is not entitled to deference.

In finding the 15:1 placement appropriate, the SRO relied on the following testimony of Ms. Giurato:

> We felt that [L.R.] would benefit from being in a self-contained class with 15 students and a teacher for him academically within a community school. So he would then—he would be in the least restrictive environment that would give him an opportunity to interact with his typically developing peers and to be able to be a part of moving outward into the greater world and having the supports of the smaller classroom.

Hearing Tr. at 74. But it is circular to attempt to demonstrate that a class is the least restrictive environment with sufficient support by merely stating that it is so. A more detailed explanation of what justified the 15:1 placement—with specific reference to L.R.'s circumstances—should have been provided to demonstrate the IEP was "reasonably calculated" to provide benefits based on L.R.'s "unique needs." *M.O.*, 793

F.3d at 238-39.

In fact, nowhere in the SRO's discussion of the 15:1 class placement does the SRO consider evidence or testimony that explains, with specifics to L.R., why a 15:1 class was appropriate.  And although her testimony was not considered by the SRO, Ms. Hibbard testified, with specifics, why a 15:1 class was inappropriate.  For example, when asked why a 15:1 environment was too large for L.R., she testified:

> Well, a 15:1 class size is 15 students to 1 teacher, so that's a class size that's too large for [L.R.] to learn.  And I'm basing that on my observation over a two-year period of working with [L.R.].  I mentioned before that [L.R.] is a student who prefers to appear to be a person that doesn't have a disability. So if he's in a classroom where he can easily disappear or check out or not even show up for class or avoid doing the work, he will.  Particularly, teachers who he doesn't have a relationship, with, amicable relationship, he will shutdown and pretend—or pretend that he gets it when he doesn't.
>
> And what you have is a student who then is resisting the teacher and that makes it very difficult for him to learn, very difficult for him to grow and so it will be really hard for him to progress.  I think in a 15:1 classroom you'd get a [L.R.] who wouldn't show any growth at all.

Hearing Tr. at 158.  Ms. Hibbard also testified why L.R. could not achieve certain IEP goals in a 15:1 setting; with respect to the goal that "by year's end, [L.R.] will identify the elements of news articles he reads on his instructional level," Ms. Hibbard testified:

> I recommend that as a goal because it's a great transition goal.  It's [a] really important life skill to be able to read the paper, but [L.R.] really needs a lot of support reading the paper because, as I said, he's a struggling reader.  And I think that if he were in a 15:1 setting and someone handed him a paper and circulated the room and check[ed] in on him on occasion, he wouldn't be able to grasp as much meaning as would further an understanding of what's going on in the news.  He wouldn't be able to build up a comprehension that he could link to other stories in the news or to background on the story or to

9

whatever.

I mean a 15:1 setting would mean that he had to read that on his own and figure on his own what it means with an occasion[al] praise prompt and leave from a teacher, which would not be able to help him—who would not be able to help identify which concepts he misunderstood as he read.

Hearing Tr. at 165-66. The SRO's failure to consider Ms. Hibbard's testimony reflects an opinion that was not thorough or well-reasoned. *See F.O.*, 976 F. Supp. 2d at 515 ("[I]t is difficult to imagine how failing to address conflicting evidence could produce a 'well-reasoned' decision.").

While the SRO did not consider Ms. Hibbard's testimony, she did acknowledge that Mr. R. and a Cooke representative stated that 15:1 was too large at the CSE meeting, but the SRO found this concern sufficiently addressed because Ms. Giurato "explained the 'continuum of services' and the June 2011 CSE's reasoning for recommending the 15:1 class placement." SRO Opinion at 16. But an explanation of the continuum of services that the DOE offers is not an explanation of why L.R.'s class placement is appropriate for him, and although Ms. Giurato testified that she explained at the CSE meeting the "reasoning for why a 15:1 would work," Hearing Tr. at 90, she did not state her reasoning on the record.

The SRO did take into account that the IEP stated L.R.'s competency levels in various areas and "also recommended extensive related services, annual goals, a transition plan, testing accommodations, and strategies to address the student's academic and social/emotional management needs." SRO Opinion at 15-16. But this merely

10

demonstrates that the SRO considered the IEP as a whole, as required, *see Karl ex rel. Karl v. Bd. of Educ. of the Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir. 1984); it does not explain why a 15:1 class is specifically appropriate to L.R.  Such an explanation does not appear in the IEP,[5] the hearing transcript, or the SRO's opinion.  Accordingly, the Court finds the SRO's opinion to be unworthy of deference, and turns to the IHO's opinion.  *R.E.*, 694 F.3d at 188-89.

## B

The IHO issued a well-reasoned decision that is supported by the record.  The IHO noted that although the CSE recommended a 15:1 class, "L.R. had been attending a smaller program for the past several years."  IHO Opinion at 10.  The IHO then commented that "[t]here is no evidence of any meaningful discussion that took place with respect to why the [CSE] felt [L.R.] was ready to learn in a larger environment."  *Id.*

The IHO turned to the testimony of the "people who really know [L.R.]," who "all expressed his need for a 'significant amount of support.'"  *Id.* She noted that both Ms. Fowler and Ms. Hibbard testified that a 15:1 class size was inappropriate for L.R.  The IHO lastly referred to Ms. Hibbard's testimony, "who admittedly had no experience with a 15:1 class[,] explained that she had taught in a 12:1 class and it was difficult for her to really assist the students in the same manner as she is able to in [L.R.]'s present setting."

---

[5]With respect to class size, the IEP provides only the conclusory statement that, "A special class in a specialized environment (12:1:1) would be too restrictive at this time."  IEP, ECF 10-8, ex. 8 at 11.

*Id.* Accordingly, the IHO found the 15:1 placement to be inappropriate.

The DOE argues that the IHO's decision is unpersuasive because it focuses on "a purported lack of evidence that '[L.R.] was ready to learn in a larger environment' than the program he had been attending at Cooke." DOE Brief, ECF 18-1, at 16. It asserts that the "proper question is whether the IEP would have enabled the student to receive educational benefits in the year it was implemented, not whether the student has demonstrated a readiness to leave his private school environment." *Id.* (citing *M.H. v. N.Y.C. Dep't of Educ.*, 2011 WL 609880 (S.D.N.Y. Feb. 16, 2011)). Granted, the fact that L.R. learned in a more supportive classroom environment at Cooke does not mean that a 15:1 class is necessarily inappropriate. *See M.H.*, 2011 WL 609880 at *11 ("By that rationale, even if the IEP had recommended exactly the amount of counseling H.H. receives at [private school], the IEP would nevertheless be inappropriate if the Parents had chosen some other private school that offered even more counseling."). But considering that L.R. had spent the previous six years in a smaller classroom, and his then-current teacher testified that he would not achieve growth in a 15:1 classroom, it is not unreasonable for the IHO to expect some evidence demonstrating that the DOE thoughtfully considered the issue to meet its burden.

The Court finds the IHO's decision to be well-reasoned and supported by the record, and defers to her decision that the 15:1 class placement was inappropriate. Accordingly, the Court agrees with the IHO that the DOE denied L.R. a FAPE for the

2011-12 school year.

## IV

With respect to prong two of the *Burlington/Carter* test—whether the unilateral private school placement was appropriate—the IHO determined that Cooke was appropriate for L.R. and the DOE did not appeal this determination to the SRO. The determination is therefore binding on the parties. 34 C.F.R. § 300.514(a); 8 N.Y.C.R.R. § 200.5(j)(5)(v) ("The decision of the impartial hearing officer shall be binding upon both parties unless appealed to the State review officer.").

On prong three—whether the equities favor tuition payment—the IHO found in Mr. R.'s favor. While the DOE appealed this issue to the SRO, she did not reach it, and the DOE did not advance an argument on this issue before the Court. Nonetheless, the Court agrees with the IHO's determination that the equities favor Mr. R. because he attended the CSE meetings, gave notice of his disagreement with the IEP and intention to place L.R. at Cooke, visited Clara Barton, and the IHO credited his testimony that an individual at Clara Barton indicated the school was not right for L.R. and suggested Mr. R. seek a different placement from the DOE. *See M.H.*, 685 F.3d at 254 (finding equitable considerations favored the parents where they "cooperated with the CSE[,] . . . provided private evaluations, participated in the IEP meeting, visited the proposed placement and provided timely notice of their intent to place the student in a private school").

In addition to carrying his burden to demonstrating the SRO erred, Mr. R. has

13

carried his burdens with respect to prongs two and three of the *Burlington*/*Carter* test.

## V

The Court concludes that the DOE denied L.R. a FAPE because, as the IHO found, the 15:1 class placement was inappropriate.  Because L.R.'s enrollment at Cooke was appropriate and the equities favor Mr. R., the Court orders the DOE to reimburse L.R.'s Cooke tuition for the 2011-12 school year.  Considering Cooke did not require Mr. R. to pay the tuition in advance, the DOE's payment should be made directly to Cooke.  *See E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 453 (2d Cir. 2014) (approving a direct-payment remedy to a private school).

**SO ORDERED.**

/S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
June 20, 2016

14